# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

MELVIN BIBBIE
ROBERT EAST

FILED
7-30-08
JUL 3 0 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CRIMINAL COMPLAINT

MAGISTRATE JUDGE COX

CASE NUMBER:

08 CR 605

I, Mark Fredkove, being duly sworn state the following is true and correct to the best of my knowledge and belief:

(1) on or around April 9, 2008, at Chicago, in Cook County, in the Northern District of Illinois, defendants did

distribute a controlled substance, namely, 50 or more grams of mixtures containing crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section(s) __841(a)__; and

(2) On or about April 25, 2008, in Cook County, and elsewhere, in the Northern District of Illinois, defendant Bibbie did

distribute a controlled substance, namely, 50 or more grams of mixtures containing crack cocaine, a Schedule II Narcotic Drug Controlled Substance

in violation of Title __21__ United States Code, Section(s) __841(a)__.

I further state that I am a(n) __Special Agent with the Federal Bureau of Investigation__ and that this complaint is based on the following facts:

Official Title

See Attached Affidavit

Continued on the attached sheet and made a part hereof:   X  Yes    ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

July 30, 2008    9:47 AM    at    Chicago, Illinois
Date                                        City and State

Susan Cox, U.S. Magistrate Judge          _____
Name & Title of Judicial Officer           Signature of Judicial Officer

STATE OF ILLINOIS    )
                     )   SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Mark R. Fredkove, Special Agent, Federal Bureau of Investigation, being duly sworn, state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice. I have been so employed for over three and a half years. I have participated in investigations involving drug trafficking activities for more than three years. In connection with my official FBI duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846. I have also been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses, informants and others who have knowledge of narcotics trafficking. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers.

2. I am responsible for investigating crimes that involve, among other things, the unlawful importation of illegal narcotics (21 U.S.C. §§ 952, 960 and 963), the possession with the intent to distribute controlled substances and the distribution of controlled substances (21 U.S.C. § 841), conspiracy to distribute and possess with intent to distribute controlled substances (21 U.S.C. § 846), the use of communication facilities to further these offenses (21 U.S.C. § 843(b)), as well as the laundering of monetary instruments (18 U.S.C. §§ 1956 and 1957). In conducting these investigations, I have used

a variety of investigative techniques and resources in several investigations that have included physical and electronic surveillance, the use of confidential sources and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience and conversations with other special agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

3. The information in this Affidavit is drawn from my interviews of cooperating sources, consensual recordings, controlled purchases of narcotics, physical surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents. Because of the Affidavit's limited purpose, it does not contain all of the facts I know about this investigation.

4. Based on the information contained in this Affidavit, I submit that there is probable cause to believe that (a) on or about April 9, 2008, MELVIN BIBBIE and ROBERT EAST knowingly and intentionally distributed a controlled substance, namely in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine (Count One) and (b) on or about April 25, 2008, BIBBIE knowingly and intentionally distributed a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine (Count Two); both in violation of Title 21, United States Code, Section 841(a)(1). Since this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include each and every fact known to me concerning

this investigation.

## Background of the Investigation

5. Since February 2008, a Cooperating Source ("CS1") has provided information that MELVIN BIBBIE, also known as (aka) "Nunay", aka "Knee Knocker," controls the distribution of cocaine and crack cocaine in area of the vicinity of 68th Street and Winchester Avenue, known as the Ghost Town area. CS1 advised that BIBBIE maintains a "stash house" at a residence located at 2032 West 69th Place, Chicago, Illinois.[1] CS1 advised that the resident of the stash house, ROBERT EAST, aka "Grimy", stores and sells crack cocaine and other drugs for BIBBIE and other Ghost Town Black P Stone Nation ("BPSN") street gang members. According to CS1, BIBBIE holds the rank of general in the BPSN gang, while EAST is a Five Star Universal Elite in the Mafia Insane Vice Lord street gang. CS1 has known BIBBIE and EAST for several years, and during that time period has observed BIBBIE and EAST conduct narcotics transactions. Through conversations with BIBBIE and personal observation, CS1 knows that BIBBIE and EAST distribute crack

---

[1] CS1 has agreed to cooperate with the FBI based on monetary compensation for services provided and reimbursement of expenses. To date, CW1 has been paid $6,744.46. CW1 has twenty-seven total arrests and seven convictions for (1) Domestic Battery, (2) Delivery of Controlled Substance, (3) Conspiracy to Distribute Controlled Substance, (4) Assault, (5) Aggravated Discharge of a Firearm, (6) Manufacture/Delivery of Cannabis, and (7) Possession of Controlled Substance. During this investigation, CS1 participated in a controlled purchase of narcotics not described herein. During that controlled purchase, law enforcement agents heard CS1 attempt to keep a portion of the buy money and narcotics for himself on the real time transmitter. After being confronted by law enforcement agents, CS1 admitted to attempting to keep money and narcotics from the agents and turned both over to the agents. Additionally, during another controlled purchase not described herein, despite being admonished by law enforcement agents regarding criminal activity, CS1 discussed smoking marijuana at a later time. On July 20, 2008, CS1 was arrested on a probation violation for failing to report. As a result, CS1's probation was extended an additional year.

cocaine and other drugs from the residence at 2032 West 69th Place, Chicago, Illinois.

6. Through his contact with BIBBIE, BIBBIE provided to CS1 his cellular telephone number as (773) 593-3335 ("Target Phone 1"). CS1 advised that he has seen BIBBIE use Target Phone 1 to facilitate drug transactions and to maintain contact with EAST and other Ghost Town BPSN gang members.

7. CS1 has participated in consensually recorded telephone conversations with BIBBIE on Target Phone 1 concerning illegal drug purchases, and has participated in three controlled purchases of crack cocaine from BIBBIE, which are described within this affidavit.

**April 2, 2008: Controlled purchase of 45 grams of crack cocaine**

8. On April 2, 2008, at approximately 9:33 a.m., CS1 met with agents and at their direction placed a consensually recorded telephone call to Target Phone 1 in order to arrange a controlled narcotics purchase from BIBBIE. CS1 dialed the phone number for Target Phone 1 in the presence of law enforcement officers, who confirmed the number was that for Target Phone 1. During the call, CS1 told BIBBIE, "I just told you boy, I need a Halsted boy (meaning 63 grams of crack cocaine)."[2] BIBBIE told CS1, "I ain't around there"

---

[2] At various points in the Affidavit, I will offer my interpretations of certain recorded conversations/meetings in brackets and otherwise. My interpretations of these conversations are based on my knowledge of the investigation to date and review of other interceptions, the contents and context of conversations, prior and subsequent conversations, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations generally. Moreover, the voice identifications for the conversations set out below are preliminary. The identification of some individuals involved in these conversations and meetings has not yet been completed. Some of these summaries do not include references to all the topics covered during the course of the conversations. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. For these recordings, I have relied on

(Ghost Town) and that he did not have his car (to travel to the area). Shortly thereafter, CS1 asked BIBBIE, "He got one over there (meaning does EAST have 63 grams of crack cocaine at the house on 2032 West 69th Place)?" BIBBIE then told CS1, "Yep" but EAST was sleep and was not answering the telephone. BIBBIE told CS1 that he would call him/her back.

9. At approximately 10:12 a.m. at the direction of agents, CS1 placed a second consensually recorded call to BIBBIE on Target Phone 1. During the call, BIBBIE told CS1 that EAST had his car and he could not do anything if EAST was not answering the telephone. CS1 asked BIBBIE, "Now, what I 'pose to do?" BIBBIE told CS1 in part, "I know, he only he probably got like . . . he got one but he probably like a seven short, that's about it (meaning that EAST had it but was seven grams short of 63 grams)." BIBBIE told CS1 that he would call him/her back.

10. At approximately 11:08 a.m., at the direction of agents, CS1 placed a third consensually recorded call to BIBBIE on Target Phone 1. During the call, BIBBIE reiterated that he could not do anything if EAST was not answering the telephone. BIBBIE told CS1, "If you see my car down there, shit just go down there (meaning if BIBBIE's car was parked outside of EAST's residence, then CS1 should go to the house because the car would indicate that EAST was at home)." Shortly thereafter, CS1 asked BIBBIE, "If I go there, tell Robert to call you?" BIBBIE answered CS1 in part, "Yeah (inaudible) call me from your phone." CS1 told BIBBIE that s/he would call him back.

---

draft-not final-transcripts of conversations.

11. After the call, agents searched CS1 for the presence of weapons, drugs or excessive money, none of which were found. An agent provided CS1 with $1,500 in funds to purchase 63 grams of crack cocaine. CS1 was equipped with a concealed audio/video recorder and transmitter that allowed law enforcement officers to monitor CW1's conversations in real time. At approximately 11:32 a.m., the concealed audio/video recorder and transmitter were activated and CS1 was transported to the area of 2032 West 69th Place, Chicago, Illinois, by a law enforcement officer. CS1 exited the law enforcement officer's vehicle and walked to EAST's residence. CS1 was kept under surveillance by law enforcement while s/he walked to the residence located at 2032 West 69th Place.

12. CS1 advised that s/he went to the rear of the residence and was let in the back door by EAST. Once in the residence, CS1 advised that s/he purchased what s/he thought to be approximately 53 grams of crack cocaine from EAST. CS1 advised that prior to the hand-to-hand exchange, EAST and CS1 discussed the selling price. CS1 utilized the speaker phone option on his/her cellular telephone during the conversation with BIBBIE on Target Phone 1. EAST informed CS1 that they (EAST and BIBBIE) were charging $1,500 for 63 grams, but CS1 was willing to pay $1,350. CS1 then requested that EAST call BIBBIE to confirm the selling price. EAST called BIBBIE on Target Phone 1 and BIBBIE confirmed the selling price of $1,500. CS1 then requested that EAST tell BIBBIE to call him/her directly to discuss the price. Shortly thereafter, CS1 received a call from BIBBIE on Target Phone 1. During the conversation, CS1 and BIBBIE negotiated a selling price of $1,260. CS1 advised agents that BIBBIE reduced the price because the weight of the crack

cocaine was three 8-balls (8-ball=1/8 ounce) short of 63 grams. According to CS1, after the selling price was agreed upon, CS1 conducted the hand to hand exchange with EAST and exited the residence in possession of the crack cocaine. CS1 was kept under surveillance by law enforcement officers while walking from the area of the residence until being picked up by a law enforcement officer at a predetermined location.

13. At approximately 12:07 p.m., CS1 met with agents and the concealed recorder and transmitter were deactivated. Agents took possession of the substance, which had the characteristics of crack cocaine, and funds not used in the transaction. Agents searched CS1 for additional contraband and money, none of which were found.

14. Although the video recorder worn by CS1 malfunctioned, CS1's conversation with EAST during the transaction was monitored by law enforcement officers present during the operation. Law enforcement officers listened to the conversation in which CS1 and EAST discussed the selling price for the crack cocaine. During the conversation, EAST stated that he would call BIBBIE to confirm the selling price. Subsequently, CS1 and BIBBIE were heard negotiating a selling price of $1,260 for approximately 52.5 grams of crack cocaine.

15. A review of subscriber records provided by Sprint-Nextel for the cellular telephone utilized by EAST during the transaction, 773-739-7858, revealed that the telephone is subscribed to ROBERT EAST, 2032 West 69th Place, Chicago, Illinois. Toll records revealed that on April 2, 2008, between 9:00 a.m. and 11:20 a.m., six calls were placed from Target Phone 1 to EAST's telephone, 773-739-7858. The call duration for each

call is one second or less, which indicates the calls were likely unanswered. During the time of the drug transaction, 11:32 a.m. and 12:07 p.m., toll records revealed that at 11:41 a.m., EAST placed a call to Target Phone 1, which is consistent with information provided by CS1 regarding the call EAST placed to BIBBIE to confirm the selling price of the crack cocaine. A review of the concealed audio/video recorder by agents revealed an apparent malfunction, as no audio or video images were captured during the transaction. The consensually recorded calls from CS1 to BIBBIE on Target Phone 1 were recorded successfully.

16. The suspected crack cocaine obtained during the transaction was subsequently analyzed by the Drug Enforcement Agency ("DEA") North Central Laboratory, which concluded that the substance was 63.9% cocaine base and weighed approximately 45.1 grams.

**Count One: April 9, 2008: Controlled purchase of 55 grams of crack cocaine**

17. On April 9, 2008, at the direction of agents, CS1 made contact with BIBBIE to arrange the purchase of 63 grams of crack cocaine. CS1 advised agents that BIBBIE confirmed he had the amount of crack cocaine requested and that he was available to conduct the transaction when CS1 was ready. The contact was not monitored or recorded by agents.

18. On April 9, 2008, at approximately 10:32 a.m., CS1 met with agents and at their direction placed a consensually recorded call to Target Phone 1 in order to initiate the controlled narcotics purchase from BIBBIE. CS1 dialed the phone number for Target Phone 1 in the presence of law enforcement officers, who confirmed the number was that for Target

8

Phone 1. During the conversation, BIBBIE told CS1 that "I left it though, Grimy got it (meaning he left the crack cocaine with EAST)." CS1 then asked BIBBIE, "Oh, you left it over there with Robert?" BIBBIE replied, "Yeah, but I took it over there last night." CS1 then asked BIBBIE in part "Can I get it for uh the one four (meaning can s/he buy the crack cocaine for $1,400)." BIBBIE responded to CS1, "No, I can't do that." CS1 subsequently asked BIBBIE if he could do $1,450. BIBBIE told CS1, "Yeah, (inaudible) can do that 1450 (meaning BIBBIE agreed to sell the crack cocaine to CS1 for $1,450)." CS1 then asked BIBBIE in part, "Want me to tell uh Robert to call you when I get there (meaning if BIBBIE wanted CS1 to have EAST call him about the price of the crack cocaine)." BIBBIE responded to CS1 in part that "I finna to just tell him to give it to you for that 1450 (meaning he would tell EAST that the price is $1,450 for the crack cocaine)."

19. After the call, agents searched CS1 for the presence of weapons, drugs and excessive money, none of which were found. An agent provided CS1 with $1,600 in funds to purchase 63 grams of crack cocaine. CS1 was equipped with a concealed audio/video recorder and transmitter that allowed law enforcement officers to monitor CS1's conversations in real time. At approximately 11:13 a.m, the concealed audio/video recorder and transmitter were activated and CS1 was transported to the area of 2032 West 69th Place, Chicago, Illinois, by a law enforcement officer. CS1 exited the law enforcement officer's vehicle and walked to EAST's residence, located at 2032 West 69th Place, Chicago, Illinois. CS1 was kept under surveillance by law enforcement while s/he walked to the residence located at 2032 West 69th Place.

20. CS1 advised that when s/he arrived at EAST's residence, EAST was in a car parked down the street from the house. CS1 advised that EAST walked down the street to meet CS1 and they both entered the rear door of the house at 2032 West 69th Place. CS1 advised that once inside the basement of the residence, CS1 counted out and gave EAST $1,450 in exchange for what CS1 believed to be 63 grams of crack cocaine. After the transaction, CS1 left the residence in possession of the crack cocaine that s/he received from EAST. CS1 was kept under surveillance by law enforcement officers while walking from the residence until being picked up by a law enforcement officer at a predetermined location.

21. At approximately 11:49 a.m., CS1 met with agents and the concealed recorded and transmitter were deactivated. Agents took possession of the substance, which had the characteristics of crack cocaine, and funds not used in the transaction. Agents searched CS1 for additional contraband and money, none of which were found. Later, agents reviewed the contents of the video and audio recording made while CS1 was meeting with EAST and confirmed CS1's description of the events on April 9, 2008.

22. At approximately 12:15 p.m., at the direction of agents, CS1 placed a consensually recorded call to BIBBIE on Target Phone 1. During the conversation, CS1 told BIBBIE that EAST acted as if he wanted to rob CS1 and that next time s/he would wait for BIBBIE. As a result, BIBBIE told CS1 that he would be present during the next transaction.

23. The suspected crack cocaine obtained during the transaction was subsequently analyzed by DEA North Central Laboratory, which concluded that the substance was 52.7% cocaine base and weighed approximately 55.6 grams.

### Count Two: April 25, 2008: Controlled purchase of 116 grams of crack cocaine

24.     At the direction of case agents, CS1 made multiple unrecorded contacts with BIBBIE to arrange the purchase of 126 grams of crack cocaine. According to CS1, during the meetings with BIBBIE, CS1 told BIBBIE that s/he was brokering the deal for out of town drug dealers.

25.     On April 22, 2008, while in the presence of BIBBIE, CS1 called an agent to inquire about the purchase, as if the agent was CS1's out of town connection. During the call, the agent asked CS1 to ask BIBBIE the selling price for 126 grams of crack cocaine. CS1 advised that BIBBIE responded $1500 for each 63 grams. The agent instructed CS1 to ask BIBBIE for a break on the price based on the quantity. CS1 advised that BIBBIE agreed to give CS1 a break on the price and reduced the selling price to $2,800. CS1 then asked what time BIBBIE would be ready to conduct the transaction on Friday (April 25, 2008). The agent overheard BIBBIE respond in the afternoon around 1:00 p.m.. CS1 confirmed that BIBBIE responded 1:00 p.m.

26.     On April 25, 2008, at approximately 12:19 p.m., CS1 met with agents and at their direction placed a consensually recorded call to Target Phone 1 in order to initiate the controlled narcotics purchase from BIBBIE. During the conversation, CS1 asked BIBBIE, "Yeah, where you at? You ready?" BIBBIE responded, "Yeah, I just walked in the door." Shortly thereafter, CS1 told BIBBIE that s/he was on his/her way.

27.     After the call, agents searched CS1 for the presence of weapons, drugs and excessive money, none of which were found. An agent provided CS1 with $2,900 in

funds to purchase 126 grams of crack cocaine. CS1 was equipped with a concealed audio/video recorder and transmitter that allowed law enforcement officers to monitor CS1's conversations real time. At approximately 12:40 p.m., the concealed audio/video recorder and transmitter were activated and CS1 was transported to the area of 2032 West 69th Place, Chicago, Illinois, by a law enforcement officer. CS1 exited the law enforcement officer's vehicle and walked to the residence located at 2032 East 69th Place. CS1 was kept under surveillance by law enforcement while s/he walked toward the residence located at 2032 West 69th Place.

28. CS1 advised that when s/he arrived at the residence s/he was let in the front door by BIBBIE. CS1 advised that s/he and BIBBIE met just inside the front door in the hallway area. CS1 advised that s/he counted out and gave BIBBIE $2,800 in exchange for what CS1 believed was 126 grams of crack cocaine. A review by case agents of the audio and video recording taken on this date revealed that BIBBIE counted the money along with CS1 and place it on the floor. After the transaction, CS1 left the residence in possession of the crack cocaine provided by BIBBIE. CS1 was kept under surveillance by law enforcement officers while walking from the area of the residence until being picked up by a law enforcement officer at a predetermined location.

29. At approximately 12:57 p.m., CS1 met with agents and the concealed recorder and transmitter were deactivated. Agents took possession of the substance, which had the characteristics of crack cocaine, and funds not used in the transaction. Agents searched CS1 for additional contraband and money, none of which were found. Later, agents

reviewed the contents of the video and audio recording made while CS1 was meeting with BIBBIE and confirmed CS1's description of the events on April 25, 2008.

31. The suspected crack cocaine obtained during the transaction was subsequently analyzed by DEA North Central Laboratory, which concluded that the substance was 46.8% cocaine base and weighed approximately 116.7 grams.

FURTHER AFFIANT SAYETH NOT.

_____
Mark R. Fredkove
Special Agent, FBI

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 30th DAY OF July, 2008.

_____
Magistrate Judge Susan Cox

13